E. W. HAMILTON *et al., Respondents,* v. KING COUNTY,
*Appellant.*[1]

[1]Reported in 79 P. (2d) 697.

*B. Gray Warner* and *F. M. Reischling,* for appellant.

*Little, Burgunder & Smith,* for respondents.

BEALS, J.—For several years prior to 1937, plaintiffs had engaged in the business of raising mink on a tract of land owned by plaintiff William Lou, near Renton Junction, in King county. Plaintiffs' original stock were carefully selected high grade "Yukon" mink.

During the breeding season of 1935, forty-four female mink were mated, of which thirty-nine whelped, giving birth to an average of four kittens per female. During the season of 1936, the thirty-nine proven breeders and thirty other female mink, born in 1935, were mated. Only one of these females raised her kittens. Plaintiffs contended that the others either aborted their young or killed and ate them after birth, because of nervousness and fright occasioned by the construction by defendant King county of a large draining ditch, which passed within five feet of the mink house, the ditch having been constructed during the whelping season.

Plaintiffs sued the county for damages suffered by reason of the failure of the 1936 mink crop. The county denied all liability, and the action was tried to the court, sitting without a jury. The case was tried May 13, 1937, and of forty-nine females of those that had been mated in 1936, and again in 1937, thirty-five had already whelped at the time of trial.

At the close of the case, Judge Roscoe R. Smith, who had presided at the trial, announced the judgment which he would render, stating that he would award plaintiffs judgment in the full sum of $1,580. Prior

to the signing by Judge Smith of any findings of fact, conclusions of law, or judgment, the judge died. Thereafter, by stipulation of the parties, findings of fact, conclusions of law, and a judgment, based upon Judge Smith's oral decision, were signed and filed.

Defendant has appealed from the judgment, assigning error upon the failure of the trial court to sustain its challenge to the sufficiency of the evidence which was interposed at the close of plaintiffs' case; upon the failure of the trial court to grant its motion for dismissal of the action made at the close of the entire case; upon the ruling of the trial court to the effect that respondents William and Ollie Lou were not, by their conduct, estopped from claiming damages because of the construction of the ditch; appellant finally contending that the damages which the trial court awarded respondents were based upon pure speculation and conjecture, and upon no evidence sufficient in law to justify any such award.

July 1, 1936, respondents filed their claim against King county, based upon alleged damages occasioned by the acts of the county in constructing the ditch hereinafter referred to, and in the course of the work frightening the female mink so that the latter failed to raise their young.

Respondent William Lou owned the land upon which the pens in which the mink were confined were situated, the tract of land being approximately 1165 feet in length by 170 feet in width. William Lou, his brother Ollie Lou, and E. W. Hamilton, all respondents in this action, were jointly engaged in the raising of mink. The land in its longer dimension ran north and south, and on its northerly end bordered on a paved road. The land sloped from north to south, the land being low and flat south of a point between three and four hundred feet south of the road.

A creek meandered across the land, and during the wet season a considerable portion of the low land was under water. The landowners in the vicinity were all anxious to have their land drained and formed a voluntary association by way of a local improvement club, of which Mr. Lou was a member. Appellant county agreed to sponsor a Federal W. P. A. drainage project, with the result that, during the month of April, 1936, the construction of a new drainage ditch was commenced under the control and direction of the county. It was proposed that the new ditch cross the Lou land from west to east, a short distance above the toe of the slope from the north, the ditch to pass not far from the southerly end of respondents' mink pens.

April 20th, a crew of men commenced to dig the ditch across the Lou land. It appears that there was some doubt as to the exact location of the proposed ditch, respondents' evidence indicating that the line proposed by the county commissioners did not approach the mink house closer than two hundred feet. In any event, several lines through the Lou property were considered, and the route finally adopted ran very close to the mink pens. In the course of the ditch digging, considerable disturbance was created, and some of the blasting shook the Lou residence, which was located some distance north of the mink pens.

Ollie Lou testified that, on or shortly after May 5th, he heard some squeaking in five or six of the pens, indicating that some kittens had arrived, but that after May 25th, he heard no further squeaks. The evidence showed that it is not good practice to examine the pens for some little time after the females have whelped, as any such examination may unduly excite the mink and cause them to kill their offspring.

Judge Smith having died after the action was tried and submitted to him for decision, and after he had

announced his conclusions and the judgment which he would sign, his oral opinion being a part of the statement of facts, the parties stipulated that findings of fact and conclusions of law based upon the decision of Judge Smith, together with a judgment, might be entered by any judge of the superior court for King county "with the same force, effect and validity as if they had been made and entered by Judge Roscoe R. Smith in his lifetime." Findings of fact and conclusions of law were prepared, it being therein recited that

" . . . the parties hereto, through their attorneys, having stipulated in writing that Judge Smith, had he lived, would have made the following findings of fact and conclusions of law."

*State ex rel. Oregon-Washington Water Service Co. v. Hoquiam,* 155 Wash. 678, 286 Pac. 286, 287 Pac. 670.

Accepting these stipulations at their face value, it appears from the findings, which were signed by Honorable James T. Lawler, one of the judges of the superior court for King county, who also signed the judgment in the action, that respondent William Lou owned the tract of land above referred to, and that, for several years prior to the digging of the ditch, a mink farm had been operated on the land; that, during and prior to the month of April, 1936, respondents had in their mink pens sixty-nine female mink which had been mated between March 12th and April 5th next preceding; that, on April 19th, appellant commenced to construct the ditch above referred to, and that, on or about April 27th, a Diesel shovel was placed in operation, which on the following day became bogged down at a point within thirty-five feet of the mink pens; that, after two days labor and considerable effort, the shovel was extricated by use of a tractor; that dynamite or a similar explosive was used to blow out stumps on both sides of the Lou land; and that, May 13th, considerable powder was

used in blasting a sandstone spit on the property imme-
diately adjacent to the Lou land.

It was also found that the ditch was constructed
through the Lou property without legal authority
therefor, or consent from the owner, and without the
granting to appellant of easements, rights of way, or
deeds, granting the right to construct the ditch, and
that, up to the time of the commencement of digging
operations, respondents were not advised as to the pro-
posed location across their land, nor of the means to be
used in constructing the same; that, commencing April
1st and continuing until May 13th, respondents warned
appellant's agents who were in charge of the construc-
tion and appellant's employees not to make any noise
which would be likely to disturb the mink; that appel-
lant's agents were advised of the probable effect upon
the female mink of any undue disturbance during the
whelping season, and notwithstanding respondents'
warnings and protests, appellant ran its shovels and
tractors back and forth across respondents' land and
used explosives in the neighborhood, causing the mink
house and the ground upon which the same was located
to be shaken and disturbed, and alarming and frighten-
ing the mink.

It was further found that, as the result of the acts of
appellant, the female mink were so alarmed and fright-
ened that out of the sixty-seven females which were
with young, only one whelped and raised her kittens;
that four of the females whelped sixteen kittens and
then, because they were frightened by the acts of ap-
pellant, destroyed their kittens; and that the remaining
female mink were so frightened and alarmed by the
acts of appellant that they aborted or absorbed their
litters.

The conclusions of law entered, followed by the judg-

ment, were in accordance with Judge Smith's oral opinion above referred to.

Appellant vigorously attacks the judgment, contending that the record contains nothing more substantial than surmise and conjecture upon which any judgment in respondents' favor can be based. Clearly, the ditch digging operations conducted by appellant across and in the neighborhood of the Lou property were conducted with considerable informality and uncertainty. The evidence, however, does not preponderate against the finding of the trial court concerning the ditch construction work.

The evidence also supports the findings of the trial court as to the ownership of the mink by respondents, and that the females had been mated. We find no reason for disbelieving the evidence introduced by respondents to the effect that their female mink had given birth to young during the 1935 season, that they did not produce young during 1936, and that they were whelping during the spring of 1937, just prior to the time of trial.

Appellant argues that the failure of the mink to reproduce during the season of 1936 may have been occasioned by improper feeding, or some other cause, such as the poor physical condition of the animals; and that, before respondent can recover, there must be an unbroken chain of cause and effect showing that, *but for* the construction of the ditch, respondents would have had a crop of mink kittens. While it is true that, before damages may be recovered, the evidence must show a reasonable basis for the amount allowed, this means no more than that proof must be introduced in a quantum sufficient to support a judgment, bearing always in mind the nature of the case and the degree of proof of which the case is susceptible. Some cases may be proved to a mathematical demonstration; others

may not. No one can read the evidence in the case at bar without being convinced that the failure of respondents' 1936 mink crop was due to the ditch digging operations of appellant. That basic fact was evidently proven to the satisfaction of the trial court, and we are in accord with that view.

Appellant correctly argues that mink are wild animals; and that, in order to have property in animals wild by nature, they must be reduced to actual possession and control. Respondents' possession of the adult mink satisfied this rule of law, and from the evidence it appears that the ordinary crop of young mink should have appeared during the spring of 1936, and would have presented themselves had not some cause, unusual and out of the ordinary, prevented.

Unquestionably, the kittens, had they been produced, would have been valuable. As to just how valuable they would have been, taking into consideration the hazards of the business, the evidence is naturally somewhat indefinite. It cannot be held, however, that, bearing in mind the rule that, in determining the quantum of proof necessary to support a judgment, the nature of the case must be considered, and the degree of proof of which the case is susceptible, the evidence does not support any judgment in respondents' favor. I Sutherland Damages (4th ed.), §§ 14, 15 *et seq.*

The construction of the ditch by the county was a drainage project, rather than one involving flood control, and for this reason, Rem. Rev. Stat., § 9663 [P. C. § 5959-1], prohibiting actions against a county for noncontractual acts or omissions in work designed to prevent flood, or for purposes of navigation, need not be considered.

From the record before us, it should be held that the owner of what we have referred to as the Lou land, by word of mouth only, granted to the county per-

mission to construct a ditch across his property. No question concerning the entry by the county upon the land for the purpose of constructing the ditch is here presented, but it must be held that the county had ample notice of the existence of the colony of mink on the tract which was to be crossed by the ditch, and that the mink should not be disturbed during the whelping season. The county, then, for its own benefit and convenience, availed itself of an informal permission to construct the ditch across the land, without compensating the owner therefor and without obtaining any writing authorizing the appropriation, for ditch purposes, of a definitely defined right of way; and it should be held that the county agreed to what amounted to a condition which accompanied the permission granted. Examination of the record convinces us that respondents were informed and believed that the ditch would be more than one hundred fifty feet from the mink pens; and, in any event, the permission to cross the land was not so broad as to give the county the right to dig the ditch anywhere it pleased.

If, in the ditch digging operation, the county had destroyed the dwelling on the property, or valuable trees growing thereon, or had destroyed the mink pens, clearly the county would have been liable. In the Restatement of the Law of Torts is found the following:

"§ 168. Conditional or Restricted Consent. A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with."

"§ 169. Consent Restricted as to Area. A consent given by a possessor of land to the actor's presence on a part thereof does not create a privilege to enter or remain on any other part."

"§ 170. Consent Conditioned or Restricted as to Time. A consent given by a possessor of land to the actor's presence thereon during a specified period of

time does not create a privilege to enter or remain on the land at any other time."

"§ 214. Liability for Excess; Trespass Ab Initio. (1) An actor who has exercised any privilege stated in §§ 167 to 213 in an unreasonable manner is subject to liability for any harm to a legally protected interest of another caused by such unreasonable conduct."

In the text cited, § 214 (1) is commented on as follows:

"a. A privilege to enter land may be unreasonably exercised either by the intentional doing of an act which a reasonable man would not regard as necessary to effectuate the purposes for which the privilege is given, or by any negligence in the manner in which the privilege is exercised. Subsection (1), therefore, applies not only where the actor deliberately abuses his privilege by doing an act which he recognizes as unnecessary or deliberately does an act which a reasonable man would so recognize, but also where the actor does not use reasonable care to prevent the exercise of his privilege from involving an unreasonable risk of harm to the legally protected interests of others."

Section 290 reads in part as follows:

"§ 290. What the Actor is Assumed to Know. For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is assumed to know

"(a) the qualities and habits of human beings and animals and the qualities, characteristics and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community; . . ."

In § 297 the rule is laid down as follows:

"§ 297. Acts Dangerous Intrinsically or Because of the Manner of Performance. A negligent act may be one which involves an unreasonable risk of harm to another

"(a) although it is done with reasonable care, skill, preparation and warning, or

"(b) only if it is done without reasonable care, skill, preparation or warning."

Under Rem. Rev. Stat., § 951 [P. C. § 8394], an action may be maintained against a county either upon a contract made in its corporate character and within the scope of its authority, or for an injury arising from some act or omission on the part of the county.

We find, then, no reason for exonerating the county from liability for damage which has resulted from the operations which it conducted, which damage was suffered because of a peculiar condition, concerning which it had ample notice.

In one particular, we are convinced that the judgment appealed from must be modified. The findings state that four of the female mink whelped sixteen kittens, of a total value of $320, and then destroyed their young, because they were alarmed and frightened by the acts of appellant's agents. This finding is not supported by the evidence. The court found that, of the sixty-eight female mink which were mated, one raised her kittens, four whelped four kittens each, and that the remaining sixty-three failed to reproduce. The sixty-seven mink should be in the same classification. The evidence does not support the finding that sixteen kittens were whelped and then destroyed by their mothers.

Appellant quotes a statement of the trial court, made in denying appellant's motion for a nonsuit at the close of respondents' case, to the effect that the court was of the opinion that respondents' case was then rather weak. While expressing that view, the court denied appellant's motion, and at the close of the entire case announced its intention to grant judgment in respondents' favor. That a plaintiff's evidence is not in all respects satisfactory, does not necessarily mean that the defendant must have judgment in his favor.

Respondents demanded a much greater sum by way of damages than that which the trial court allowed. The amount of the award is well within the evidence, assuming that, under the law, appellant is liable to respondents upon the cause of action pleaded and tried.

We have examined the many authorities cited by appellant, but find none which requires a holding that the judgment appealed from must be reversed. The trial judge carefully summed up the evidence at the close of the case and announced what was evidently his carefully considered opinion as to the judgment which should be entered.

We find nothing in the record which requires reversal of the judgment appealed from upon the ground that respondents are barred from any recovery upon the ground of estoppel.

Save in the particular above referred to, it cannot be held that the evidence preponderates against the findings. The judgment appealed from will be modified, and the cause remanded with instructions to enter a new judgment in accordance with the views herein expressed. Any inconsistency which may be found to exist between the evidence and the oral opinion of the trial court on the one hand, and the findings on the other, as to the number of female mink which lost their young, may be corrected to agree with the evidence at the time of the entry of the judgment. Appellant will recover its costs in this court.

STEINERT, C. J., MAIN, HOLCOMB, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting)—Whatever damages plaintiffs suffered were not only conjectural, but wholly consequential—incidental to the performance of a public work in a lawful and reasonably careful manner. In the facts stated in the majority opinion, I can find no

breach of contract, no trespass, no negligence. In fact, in his oral argument, counsel for plaintiffs explicitly stated that they were not relying upon negligence as a basis for recovery. He did assert that their cause of action was predicated on § 16, Art. I, of the state constitution, which provides:

"Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right of way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. *Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question . . .*" (Italics ours.)

It is difficult to imagine a court granting an order of necessity for the taking or damaging of unborn mink. It is equally difficult to imagine that, in an action to condemn property for a public improvement, a court would consider the loss of unborn mink as an element of damage.

In any event, I think one who brings wild animals into a thickly populated community should be held to assume the risk of loss which, in whole or in part, results from their temperamental instability.

I dissent.

MILLARD, J., concurs with BLAKE, J.

GERAGHTY and ROBINSON, JJ., dissent.